UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **AHMAD JOHNSON,** | **Civil Action No. 15-8896 (SDW)** |
| **Petitioner** | |
| **v.** | **OPINION** |
| **STEPHEN JOHNSON, et al.,** | |
| **Respondents** | |

**WIGENTON**, District Judge:

Presently before the Court is the amended petition for writ of habeas corpus under 28 U.S.C. § 2254 ("Amended Petition") by Petitioner Ahmad Johnson, a New Jersey state prisoner, challenging his conviction and sentence for carjacking, murder, attempted murder, weapons charges, and witness tampering. (ECF No. 20).   Respondents filed an amended answer (ECF No. 23).[1]  Justin Loughry, Esq. entered an appearance on behalf of Petitioner on May 6, 2021.  (ECF No. 11).  On August 31, 2021, Mr. Loughry filed a reply brief on Petitioner's behalf.  (ECF No. 15).  Mr. Loughry withdrew from his representation of Petitioner on July 19, 2022.  (ECF No. 25).[2]  This Court will determine the Amended Petition on the briefs pursuant to Federal Rule of Civil Procedure 78(b).  For the following reasons, Petitioner's Amended Petition is denied, and Petitioner is denied a certificate of appealability.

---

[1] The state court records are attached as exhibits to Respondents' original answer in Docket Entry No. 9, and referred to herein by the docket and page numbers assigned by the Court's Case Management Electronic Case Filing system, CM/ECF.

[2] Although the briefing was completed, Petitioner was given an opportunity to find substitute counsel.  (ECF Nos. 26-32).  Petitioner was unable to obtain counsel within the time provided. Because no evidentiary hearing is required, see 28 U.S.C. § 2254(e)(2), Petitioner may proceed *pro se*.

## I. BACKGROUND

On or about October 17, 2006, Petitioner was charged in a twelve-count indictment in the Superior Court of New Jersey, Hudson County with carjacking, attempted murder, aggravated assault, murder, witness tampering, and weapons charges.  (ECF No. 9-4).  After a jury trial in January 2010 (ECF Nos. 40-48), Petitioner was convicted on all counts.[3]  (ECF No. 9-48 at 71-72; ECF No. 9-10 at 2, 37-38).  On count 9, the first-degree murder charge under N.J.S § 2C:11-3a(1), Petitioner was sentenced to a term of life imprisonment without parole, with consecutive sentences on count 1, carjacking in violation of N.J.S. § 2C:15-2; count 3, third-degree unlawful possession of a weapon in violation of N.J.S. § 2C:39-5b; count 4, first-degree attempted murder in violation of N.J.S. §§  2C:5-1; 2C:11-3; and count 7, third-degree unlawful possession of a weapon in violation of N.J.S. § 2C:39-5b.  (ECF No. 9-10 at 3).

The Superior Court of New Jersey, Appellate Division made the following findings of fact on direct appeal:

> On March 3, 2005, at approximately 8:00 p.m., Officer Eric Infantes of the Jersey City Police Department saw Piotr Raczek waving him down as he drove down the street. Officer Infantes testified Raczek was hysterical and "moving around constantly just trying to tell us what happened." Raczek told Infantes he had just parked his car, a blue Subaru WRX STI model,[4] when he was approached by two men. One of the men pointed a pistol at Raczek and ordered him to turn over his car keys and walk away. One of the men told Raczek that, if he turned around, he would be shot. The men then drove away in Raczek's car. Raczek described the man with the gun as "a Black male, dark skinned, approximately five-ten, 16, 17 years of age," with "a very narrow face" and "big cheek bones." The man was dressed in a black jacket and black pants and wore a black knit

---

[3] The jury did not reach count 5, second-degree aggravated assault, because it was a lesser included offense of count four, attempted murder.  (ECF No. 9-10 at 2.)  Count eight, witness tampering of Mr. Herring, was dismissed by the State prior to trial.  (*Id.*)

[4] Raczek's friend, Erik Wildermann described the vehicle as a "rally car," meaning it was "a very fast car, it has a lot of horsepower."

cap with red stripes on it. Raczek gave a similar description for the second assailant. Detective Keith Armstrong took Raczek to the police station and showed him some photos from the department's juvenile files. However, Raczek was unable to identify either suspect from the photos he was shown.

On March 5, 2005, two days after the carjacking, Lawrence Herring and his wife, Karen Walker-Herring, arrived at their home in Newark and noticed a blue car parked across the street from their house. Herring testified he recognized the car as one that he believed had been following him over the past "couple of days." As the couple brought their groceries into their house, the car drove away. Later that evening, Herring picked up his friend, John Umstead, in his Ford Explorer and, as he drove around Newark, Herring noticed the same car. Herring pulled over and the car pulled next to him. Herring rolled down his window and he was shot multiple times in the face, back and shoulder. Umstead moved into the driver's seat and drove Herring to the hospital. At trial, both Herring and Walker-Herring identified Raczek's vehicle as the car they each observed that day.

Walker-Herring was notified of the shooting and she and the couple's daughter, who was home from college, went to the hospital. Defendant had formerly dated the Herrings' daughter.

Herring objected to this relationship and testified he had an argument with [D]efendant on the telephone in which he told [D]efendant he could no longer see his daughter. As Walker-Herring was driving to the hospital, her daughter received a telephone call from [D]efendant and, about an hour later, [D]efendant arrived at the hospital. Walker-Herring testified that when a doctor came to speak to the family, [D]efendant asked him whether Herring would be able to remember the shooting.

About two or three days after the shooting, Walker-Herring noticed the same blue car following her. She drove to the Irvington Police Department and gave police the license plate number of the car. The plate came back as belonging to Raczek's stolen vehicle. Detective John La Bella of the Newark Police Department obtained a photo of Raczek's car and showed it to Herring at the hospital. Herring identified it as the one involved in the shooting.

On March 9, 2005, the Newark police advised Detective Armstrong of this. Detective La Bella assembled a photo array of six suspects, including a photo of [D]efendant, and gave it to Detective Armstrong. On March 10, Detective Armstrong picked up Raczek

3

and brought him to the station to review the photos. He testified he gave Raczek written instructions "on how the array is conducted, what it consist[s] of" and had Raczek sign the form to indicate he had read and understood it.

Detective Armstrong showed the photos to Raczek one at a time. The detective testified that Raczek looked at the first four photos and said "no" to each one. When Raczek got to the fifth photo, however, the detective testified Raczek "actually became teary eyed. He actually paused. He stopped for a minute." The detective then showed him the sixth photo and Raczek said "no" to that one. After he regained his composure, Raczek asked to see the photos again. When he reviewed the fifth photo, Raczek said "that's him. Again, he became teary eyed, nervous, a little shaky." Detective Armstrong testified Raczek said he was "sure" of his identification. Raczek signed and dated the photo he had selected. Defendant was the individual in the fifth photo.

Detective La Bella testified that Raczek's car was thereafter recovered in Irvington, about two or three blocks from [D]efendant's residence. The car was placed in the Irvington impound lot. Herring and Walker-Herring were taken to the lot to see the vehicle. Herring testified it was the car that was involved in the shooting and Walker-Herring again confirmed it was the car that had been following her. Defendant was arrested on the carjacking charge, but was released on bail. On July 27, 2005, he was indicted on the carjacking charge. A pre-arraignment conference was held on August 30, 2005. One day later, on August 31, Raczek was murdered. Henry Rivera testified he had been "hanging out" with [D]efendant during the Summer of 2005 and saw him "basically" every day. Defendant told Rivera he had committed the carjacking with another individual known as "L." Defendant also admitted he had used Raczek's car when he shot Herring. "L" was with [D]efendant at the time of the shooting. According to Rivera, [D]efendant was "stressing" about the pending carjacking case and was worried it would lead to him being charged for the Herring shooting.

On August 31, [D]efendant picked up Rivera in [D]efendant's dark green Lumina, which had tinted windows. Defendant told Rivera that he "was going to try to persuade [Raczek] not to come to [c]ourt, rob him." Defendant further explained "[h]e was going to try to bribe him, holla at him, see if he could take some money, try to intimidate him[.]" Around 10 p.m. that night, Allison DeRobertis, who lived on Raczek's street, testified she saw a green car with tinted windows circling the block. Wildermann, who lived on the same street, saw the vehicle stop on the street. Two men got out and asked him if they

could park by a fire hydrant. Wildermann told the men they would probably get a ticket if they parked there.

Wildermann went back into his house and saw the men walking back to the car. Rivera testified that [D]efendant drove around looking for parking and then stopped again on Raczek's street. Defendant got out of the car and Rivera saw he was carrying a gun. While Rivera was sitting in the car, [D]efendant called him twice on his cell phone. The second time, [D]efendant told Rivera he had seen Raczek. Defendant's phone records were admitted in evidence and showed that he had made two calls, one at 10:49 p.m. and the other at 10:52 p.m. to a cell phone subscribed to by Rivera's wife.[5] Detective Kevin Wilder of the Hudson County Prosecutor's Office testified both phone calls were made within one mile of a cell tower located 500 feet from where Raczek was found shot.

After the second call, Rivera testified that he heard gun shots. Defendant then jumped into the car and drove off. DeRobertis testified that after hearing gunshots, she again saw the green car driving down the street.

Defendant drove Rivera back to Newark so [D]efendant could "[s]witch cars" at "his mom's house." Defendant wanted to "double back" to Jersey City "[t]o make sure Piotr was down." Defendant's cell phone records revealed that his cell phone moved from Jersey City to Newark between 10:52 p.m. and 11:08 p.m. After switching cars, Rivera testified [D]efendant drove to a female friend's house and "[d]umped the gun on her[.]"

Defendant and Rivera then drove back to Jersey City. Defendant's cell phone records revealed a call was placed at 11:59 p.m. using a cell tower near Journal Square in Jersey City. When [D]efendant and Rivera got near Raczek's house, they saw the police activity there and [D]efendant drove Rivera to Rivera's home in Bloomfield. At approximately 10:54 p.m., Officer Maria Ruocco of the Jersey City Police Department responded to a call "for shots fired[.]" She testified she found Raczek "lying on his side in a fetal position" in front of his house. She could not detect a pulse. Dr. Lyla Perez subsequently performed an autopsy and testified Raczek had been shot six times in the chest and torso.

Detective Wilder also responded to the scene immediately following Raczek's shooting. However, when he learned [D]efendant had been

---

[5] Two cell phones were covered by this subscription plan. Rivera testified he and his wife each used one of the phones and that the calls were made by Defendant to the phone he used.

indicted, the preceding day, for hijacking Raczek's car, he along with other officers proceeded to [D]efendant's home in Irvington. The officers found a dark green Lumina with tinted windows parked in the driveway. Defendant was at the home and told Detective Wilder he had been home since 10:00 p.m. the previous evening. Defendant voluntarily gave the detective his cell phone number and consented to a vehicle search. No evidence was found during the search. Defendant was not arrested at that time.

According to Detective Wilder, [D]efendant later gave two statements to the police. On September 19, 2005, he again told the detective he had been home on the night of the shooting. On September 29, he told the detective he had loaned his cell phone "out to somebody whom he doesn't remember and got it back" about 10:00 p.m. on the evening of the shooting. Defendant was subsequently arrested. On February 13, 2007, he sent a letter from jail to a friend, Rasheen Smalls. The letter was recovered by the Internal Revenue Service as part of an unrelated investigation and then turned over to the Hudson County Prosecutor's Office. By this time, Rivera had already agreed to testify against [D]efendant at trial. In the letter, which Rivera read at trial, [D]efendant told Smalls that Rivera "threw him under the bus for no reason."

Defendant asked Smalls to tell a mutual friend, Abdul Meyers, "to holla at this man [indicating Rivera] and tell him to fix what he fucked up." Smalls was also instructed to "[t]ell him under no circumstances can he get on the stand." Defendant also asked Smalls and others "to push up on him and don't let him finish me please." Defendant testified at trial. He denied carjacking Raczek's car or shooting Herring. He claimed he had a good relationship with Herring. Defendant also denied murdering Raczek. Instead, he implicated Rivera in that crime. Defendant testified he loaned his car and cell phone to Rivera around 8:00 p.m. the night of Raczek's death. At approximately 11:00 p.m., Rivera returned the car, but not the cell phone. Defendant testified Rivera returned with his cell phone at 3:00 a.m. and told [D]efendant he "hollered at the old boy for [him]." When [D]efendant asked Rivera what he was talking about, Rivera said Raczek "wasn't coming to Court. You don't got nothing to worry about." Defendant stated he never provided this information to the police in any of his statements because he was "being a good friend" to Rivera.

(ECF No. 9-10 at 6-14) (alterations added).

On or about April 27, 2010, Petitioner was sentenced to life without parole, with additional consecutive sentences.  (ECF No. 9-5 at 1).  Petitioner appealed, and the New Jersey Superior Court, Appellate Division ("Appellate Division") denied his appeal on March 27, 2013.  (ECF No. 9-10).  The New Jersey Supreme Court denied Petitioner's petition for certification.  (ECF No. 9-14).

On December 6, 2014, Petitioner filed a petition for post-conviction relief ("PCR"), raising six claims for relief.  (ECF No. 9-19 at 63-77).  The PCR court held oral argument, without an evidentiary hearing, on July 21, 2016 (ECF No. 9-50), and denied PCR relief.  (ECF No. 9-19 at 81).  Petitioner appealed (ECF No. 9-18 at 1-77), and on January 16, 2018, the Appellate Division reversed and remanded for an evidentiary hearing. (ECF No. 9-27 at 1).  The PCR hearing was held over three days in March and April 2019.  (ECF Nos. 9-51, 9-52, 9-53).  On May 6, 2019, the PCR court denied relief.  (ECF No. 9-30 at 26-53).  Petitioner appealed.  (ECF No. 9-28).  The Appellate Division affirmed the PCR court's opinion on February 10, 2020.  (ECF No. 9-35).  On February 25, 2020, Petitioner filed a petition for certification in the New Jersey Supreme Court, which was denied on May 22, 2020  (ECF No. 9-36, 9-38).

## II.  DISCUSSION

### A.  Legal Standard

Under 28 U.S.C. § 2254(a), a district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  The statute precludes review of state law claims.  *Estelle v. McGuire*, 502 U.S. 62, 67–68, (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).  "[A] determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Further, "[s]tate-court decisions are measured against [Supreme Court] precedents as of 'the time the state court renders its decision and cannot be held unreasonable only in light of later decided cases."  *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 182 (2015) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003)).  "A state court decision involves an unreasonable application of clearly established federal law when no fairminded jurist could reach the state court's conclusion under Supreme Court precedents."  *Id.* (quoting *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (internal quotation marks omitted).  "Similarly, if a petitioner alleges the state court's decision 'was based on an unreasonable determination of the facts' under § 2254(d)(2), it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.'"  *Id.* (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (internal quotation marks and alteration omitted)).

**B.  Analysis**

**1.  Grounds One and Two:  Ineffective Assistance of Counsel-Jury Selection**

In Ground One of the Amended Petition, Petitioner asserts that his trial counsel and appellate counsel provided ineffective assistance, in violation of the Sixth Amendment, by failing to object or appeal when the trial court ignored mandatory New Jersey AOC Directives ("AOC Directives" or "Directives") guiding the jury selection process.  (ECF No. 20 at 16, citing *State v. Morales*, 390 N.J. Super. 470, 472 (App. Div. 2007)).  Specifically, Petitioner submits that the trial court violated AOC Directive #4-07A and its subparts by

(1) failing to give jurors a written list of witnesses,

(2) failing to "read and review each question *en banc* with the first jurors seated in the box" and instruct the jurors to pay close attention; and

(3) failing to "instruct that, unless requested by a particular juror, the questions will not be read again" and

(4) failing to "preliminarily ask each replacement juror if he or she understood the questions when they were read earlier. If the juror requests clarification or rereading of any one or more of the questions, the judge shall do so[;]" and

(5) failing to provide some explanatory commentary, in their own words, about the intent and meaning of some or all of the questions;

(6) failing to "inform the jurors in the box and the array that jurors will also be individually asked several questions they will be required to answer in narrative form. … "One such question will be the biographical question contained in the standard questionnaire[;]"

(7) failing to ask any open-ended questions verbally or in writing, and did not *verbally* pose the two omnibus qualifying questions to any of the potential or actual jurors;

(8) failing to read the biographical question, in its entirety, to any potential juror;

(9) failing to ask, either orally or in writing, whether any of the potential jurors knew the victim of the carjacking and murder.

9

(ECF No. 20 at 16-18) (paraphrased).  Petitioner's trial counsel testified that he did not agree with the AOC Directives.  (*Id.* at 19-20).

Petitioner acknowledges that AOC Directive #4-07 modified the Jury Selection Standards promulgated by AOC Directive #21-06.  The first modification authorizes judges,

> as an alternative procedure, to conduct jury voir dire without being required to verbally ask each question to each juror. Under this alternative procedure the questions must be provided to the jurors in print, and at a minimum, the voir dire elements described must be part of the process.

(*Id.* at 22, citing AOC Directive #4-07).  Petitioner asserts the trial court did less than the minimum required, and his counsel failed to object.  (*Id.*)  Moreover, Petitioner contends that, under state law, he was not required to prove his jury was biased to obtain a reversal of his conviction.  (*Id.* at 23, citing *Gonzalez v. Silver*, 407 N.J. Super. 576, 596 (App. Div. 2009), and *State v. Morales*, 390 N.J. Super. 470, 475 (App. Division 2007)).

Respondents oppose relief on Ground One of the Amended Petition for the following reasons.  (ECF No. 23 at 31-36).  At the first PCR hearing, Judge DePascale, who had presided over Petitioner's trial, explained that he had discussed the jury selection process with counsel. "Both [counsel] agreed the process would expedite jury selection, while providing them with a greater opportunity to examine potential jurors directly where they felt it necessary than that offered by the procedure outlined in the Directive."  (ECF No. 9-50 at 8).  The parties had agreed upon the following process for conducting jury voir dire:

> Following the court's preliminary instruction, each potential juror was provided with a questionnaire containing the Directive's required questions, and a second form requiring biographical information. Upon completion of these forms, jurors were called to take seats in the jury box. If an answer on the questionnaire raised any issue at all, the juror was required to come to sidebar and was examined by the Court and counsel on the record.

> Following the examination, if the juror was not excused, he or she would take a seat in the jury box and be asked, utilizing the file sheet, to, "Tell us a little bit about yourself," an open-ended question. The Court then engaged the juror directly to ensure counsel could get a feel for the juror.
>
> Following the Court's inquiry, counsel were then permitted to directly engage with the juror. The only limitation imposed upon counsel's questioning was a prohibition on case-related hypotheticals. The theory underlying the process was that counsel and the defendant were in the best position to know when they felt further or more detailed information was required to enable them to make an informed selection.

(ECF No. 9-50 at 8-9).

At the PCR remand hearing, Petitioner's trial counsel, John P. Dell'Italia ("Dell'Italia"), testified that Judge DePascale's jury-selection process "was what I've been doing for years[,]" and while he did not know if the Directives were "scrupulously honored," he "didn't see anything out of the ordinary." (ECF No. 9-52 at 69). Dell'Italia also testified that Judge DePascale gave counsel the opportunity to submit specific questions for the jurors and to ask additional questions at sidebar. (*Id.* at 92). Thus, Respondents contend Petitioner has failed to establish that the decision of the Appellate Division, denying Petitioner's ineffective assistance of counsel claims on the prejudice prong of the *Strickland* test, was "contrary to, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States."[6]

In his reply brief, Petitioner contends he established the prejudice prong of his ineffective assistance of counsel claims because the AOC Directives are mandatory. (ECF No. 24 at 21-37).

---

[6] Respondents also submit that Ground One of the Amended Petition relies solely on state law and fails to state a cognizable habeas claim. (ECF No. 23 at 78-79). This ignores the fact that Petitioner asserts a federal claim in Ground One, ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution. This Court will address the merits of this federal claim.

The purpose of the Directives is to ensure fairness in jury selection and obtain an impartial jury. Thus, Petitioner suggests that prejudice should be assumed when the Directives are not followed. Alternatively, Petitioner asserts that four of the jurors would not have been seated if the Directives had been followed. Two of those jurors harbored misgivings about the presumption of innocence and concepts of reasonable doubt, and they were not asked any open ended questions to explore their beliefs.   A third juror had a relative and a friend who worked for the Jersey City Police Department, the same police department that investigated this case.   A fourth juror, Juror No. 10, was selected for the jury without disclosing that he was a neighbor of the decedent, and a family friend of an important prosecution witness, Erik Wildermann.

Ground Two is related.   In Ground Two of his Amended Petition, Petitioner alleges his trial and appellate counsel provided ineffective assistance by failing to object to Juror No. 10, Luis Colon ("Colon"), remaining on the jury.   (ECF No. 20 at 25-30).   When Colon saw the State's witness, Eric Wildermann ("Wildermann"), Colon told the trial court that he knew Wildermann and Wildermann's entire family.   The trial court questioned Colon about his ability to remain impartial, but Petitioner contends the trial court's questions were insufficient.   The trial court did not ask Colon whether he gained any information about the trial from Wildermann or his family. Additionally, during the jury selection process, Colon had not disclosed that he lived two blocks from the scene of the murder.   Colon had opportunities where he might have communicated his knowledge of the witness or the location to the other jurors.   The trial court questioned Colon in front of the other jurors, and failed to instruct Colon not to discuss his knowledge with the other jurors.

Furthermore, Petitioner asserts that AOC Directive #21-06 provides "[w]hen there is something particular about the juror that raises a red flag in a particular case . . . follow-up

questioning should be sufficiently probative to ferret out the ability of the individual to fairly judge the case . . . [m]erely asking whether, notwithstanding the apparent impediment, he or she could be fair and impartial, with a conclusory answer is not sufficient." (ECF No. 20 at 28). Petitioner contends the trial court did no more than ask whether Colon could be fair and impartial, and accepted his response without question. Petitioner contends that prejudice should be presumed because prejudice is impossible to prove in the absence of a proper voir dire. Therefore, he concludes that his trial and appellate counsel were ineffective by failing to challenge the trial court's decision to allow Colon to remain on the jury.

In opposition to this claim (ECF No. 23 at 36-41), Respondents argue that the Appellate Division's decision should be upheld because the trial court found Colon had only a casual acquaintance with Wildermann and had only exchanged pleasantries with him once in the past six months. Furthermore, Dell'Italia testified at the PCR remand hearing that he did not see a problem with Colon's relationship with Wildermann, nor was he concerned that Colon was familiar with the scene of the murder; he thought it might have been useful to the defense. Based on observing Colon's demeanor during his cross-examination of the State's witnesses, Dell'Italia believed Colon had not formed an opinion about the trial.

In his reply brief (ECF No. 24 at 33-37), Petitioner stresses that Colon had known Wildermann for two decades. Petitioner asserts that Colon must have heard about the carjacking and murder because he lived within a few blocks of the incident. His trial counsel should have been shocked by this juror's disclosure and pressed for his removal. Instead, the "slipshod" voir dire process allowed this to occur. Petitioner contends that it is asking too much for Colon to put his knowledge of the witness and the crime scene out of his mind and fairly deliberate. Therefore, Petitioner submits that he was prejudiced by his trial and appellate counsel's failures to object.

Habeas review is of the "'last state-court adjudication on the merits of the petitioner's claim.'"  *Brown*, 142 S. Ct. at 1528 (quoting *Greene v. Fisher*, 565 U.S. 34, 40 (2010)).  This claim was denied by the Appellate Division on appeal of the PCR remand decision, where the court stated, "we affirm the judge's denial of [D]efendant's PCR petition substantially for the reasons detailed at length in his comprehensive written opinion."  (ECF No. 9-35 at 11) (alteration added).  Thus, habeas review is of the PCR court's decision on remand.

Under the "contrary to" clause of § 2254(d)(1), "it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome."  *Rosen v. Superintendent Mahanoy SCI*, 972 F.3d 245, 252 (3d Cir. 2020) (quoting *Matteo v. Superintendent SCI Albion*, 171 F.3d 877, 888 (*en banc*) *cert. denied* 528 U.S. 824 (1999)).  Petitioner has not identified a factually similar Supreme Court case, subject to "contrary to" habeas review.  Therefore, this Court must determine whether the PCR court's opinion on remand involved an unreasonable application of the Sixth Amendment right to effective assistance of counsel.  The PCR court, in its opinion dated May 6, 2019, identified the *Strickland* standard for analysis of Sixth Amendment ineffective assistance of counsel claims and determined the ineffective assistance of counsel claims as follows.

> AOC Directives #21-06 and #4-07 (Exhibits A and B to Petitioner's Brief) provide trial courts with procedures and questions to use during jury selection.  AOC Directives are "unquestionably binding on all trial courts." State v. Morales, 390 N.J. Super 470, 472 (App. Div. 2007).  However, the Appellate Division interpreted the Directive "as leaving only a limited amount of judicial discretion, covering the ability to deal with unanticipated 'circumstances as they evolve during the process.' In addition, '[s]ome degree of latitude to allow for variation in style is acceptable, so long as the essential ingredients of a thorough and meaningful voir dire are included.'" Id. at 474-475. A case should be reversed if it can be said that a "miscarriage of justice,"[] *R*.2:10-1,[] a biased jury,

resulted from failing to follow the [D]irective's requirements. <u>Gonzalez v. Silver</u>, 407 N.J. Super 576, 596 ([A]pp. Div. 2009).

The defendant is correct in stating that the [t]rial [c]ourt did not provide the potential jurors with a written list of witnesses or victims. However, the [t]rial [j]udge did verbally list the names of all potential witnesses and did read the Indictment, including the Count in which the alleged victim was Piotr Raczak….

Petitioner claims that both [t]rial and [a]ppellate [c]ounsel were ineffective in that they did not object or raise issues with the [t]rial [j]udge's failure to strictly comply with the AOC [D]irectives. A review of the record indicates that the [t]rial [j]udge [he] did not specifically ask the biographical questions, however, did ask potential jurors something to the effect of "tell us something about yourself[.]" There also were no three open ended questions asked. The omnibus questions referred to in the guidelines were asked as question numbers 28 and 29 in this [t]rial.  It cannot be found that a biased jury resulted from the [t]rial [j]udge's failure to strictly comply with the AOC [D]irectives. Rather, the case law permits some judicial discretion in covering the questions in the jury selection process.  Petitioner can point to no evidence that indicates that a biased jury resulted from not complying strictly and word for word with the AOC [D]irectives.

The petitioner next claims that both [t]rial and [a]ppellate [c]ounsel for Petitioner were ineffective because they failed to excuse two jurors during jury selection.  Apparently, during jury selection, proposed Juror No. 11 stated that he had an issue regarding the question of presumption of innocence[,] and Juror No. 13 indicated that he had a problem with the State's burden of proof.  A review of the [t]rial [transcript] indicates that Judge DePascale asked both jurors whether they understood the question, it became apparent that the jurors did not understand the question[,] and when the question was explained to them, both Juror No. 11 and 13 indicated they did not have an issue with the presumption of innocence or regarding the State's burden of proof.  Petitioner's [t]rial [c]ounsel, John Dell'Italia testified in this matter and in regard to this very issue. The Court finds Mr. Dell'Italia to be credible in this regard.  Trial [c]ounsel clearly indicated during his testimony that it was quite apparent that the two [j]urors simply misunderstood the question[,] and that after a brief discussion with the [t]rial [j]udge both [j]urors then understood the question and had no issue with the presumption of innocence or the burden of proof.  Therefore, [t]rial [c]ounsel indicated there was no reason to excuse these [j]urors. Based on that testimony and a review of the record, the Petitioner fails to meet

either [p]rong of the <u>Strickland</u> test[,] as he has not shown that [c]ounsel's performance was deficient by failing to excuse either of these [j]urors and certainly has not demonstrated that this contributed to his conviction.

Petitioner next claims [c]ounsel was ineffective for failing to excuse Juror No. 2 who indicated during jury selection that he was familiar with a State's witness Detective Infantes. Again, Mr. Dell'Italia testified in this regard and the [j]uror was questioned by the [t]rial [j]udge[,] and the proposed [j]uror indicated that any knowledge of the proposed State's witness was in passing[,] and that the [j]uror was friends with the witness's brother. The [t]rial [j]udge followed this up with questioning as to whether this would impact the ability of the [j]uror to render a fair and impartial verdict. Based on the [j]uror's answers that the [j]uror could be fair, apparently neither party chose to excuse or asked for a challenge in regard to this [j]uror.

Petitioner next claims that Juror No. 10 was biased in this matter, as he knew a State's witness, Eric Wildermann. This issue will be discussed later in this opinion, however, it is relevant here as the [j]uror did not disclose his familiarity with the proposed witness during jury selection. Rather, the [j]uror made it known to the Court during the testimony of Wildermann that he in fact knew [] Wildermann and[,] in fact[,] knew Wildermann's family for quite some time. The [t]rial [c]ourt conducted a [v]oir [d]ire of this [j]uror[,] who indicated that he could be fair and impartial. The [t]rial [c]ourt went on to note that while there was a relationship or knowledge between the [j]uror and Mr. Wildermann, the [j]uror did not even know Mr. Wildermann by name. Mr. Dell'Italia testified in regard to this issue also. The Court accepts as credible Mr. Dell'Italia's testimony that he felt that Juror No. 10 could be fair and impartial despite having some knowledge of Mr. Wildermann. The fact that the [j]uror did not disclose that he knew [] Wildermann during jury selection (as apparently he did not recognize the name) in no way proves either [p]rong of the <u>Strickland</u> test. Petitioner's argument is based on mere speculation. Apparently, the Petitioner would have the Court hold that any [j]uror who misunderstood a question or any [j]uror who was somehow familiar with some facet of the case, for example, the location of the incident, no matter how fleeting[,] should be automatically dismissed from the [j]ury. There is absolutely no proof presented to this Court that any of the [j]urors were tainted or biased in any way. Further, Mr. Dell'Italia testified during the [e]videntiary [h]earing that he did not ask to excuse the Juror No. 10[,] after that [j]uror informed everyone that he was familiar with the witness Wildermann because Mr. Dell'Italia[,]

16

> after consultation with the Petitioner[,] felt that Juror No. 10 would
> or might be favorable to the defendant based on interactions or body
> language during the trial.

(ECF No. 9-30 at 37-41) (alterations added).

The PCR court on remand correctly identified the *Strickland* test for Sixth Amendment ineffective assistance claims. The Sixth Amendment right to counsel guarantees counsel whose performance is reasonable under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To state a claim of ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness, determined under all of the circumstances. *Id.* "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. An attorney's performance may not be judged in hindsight but evaluated from counsel's perspective at the time. *Id.* To establish deficient performance, a defendant must overcome a presumption of sound trial strategy. *Id.*

Absent actual and constructive denial of counsel where prejudice is presumed, a defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In determining prejudice "a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law." *Id.* at 694-95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. In assessing prejudice, a reviewing court must consider the totality of the evidence before the judge or jury. *Id.* A verdict with overwhelming record support is less likely to have been affected by errors. *Id.* at 696. "[A] court

making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.*

At the outset, Petitioner contends that prejudice should be presumed based on a deficient jury selection. Petitioner has not identified, nor is this Court aware of, Supreme Court precedent that requires a presumption of prejudice for failing to explicitly follow a State's jury selection procedures or from not excusing jurors who have less than a close relationship to a witness or a juror who lives near the crime scene.[7] Therefore, this Court examines both the deficient performance and prejudice analysis by the Appellate Division.

First, the Appellate Division determined that "Petitioner can point to no evidence that indicates that a biased jury resulted from not complying strictly and word for word with the AOC [D]irectives." Based on this Court's review of the jury selection transcript and the record as a whole, a fairminded jurist could reach this conclusion. The jury selection procedure used here asked jurors the most basic questions about their potential biases on a written questionnaire, asked jurors the open-ended question to tell the Court about themselves, and then permitted counsel to ask any follow-up questions. Where a court inquires of "each [juror] individually to uncover concealed bias . . . [t]his face-to-face opportunity to gauge demeanor and credibility, coupled with information from the questionnaires regarding jurors' backgrounds, opinions, and sources of news, gave the court a sturdy foundation to assess fitness for jury foundation." *Skilling v. United States*, 561 U.S. 358, 395 (2010). The procedure used here does not reflect constitutionally deficient performance by counsel under this standard.

---

[7] This Court also notes the Appellate Division, quoting *Gonzalez*, 407 N.J. Super at 596, held that state law requires a showing of a biased jury for reversal based on failing to follow the Directives. Thus, the Court rejected Petitioner's argument that failure to follow the mandatory Directives, without more, required reversal.

Second, the Appellate Division held Petitioner failed to establish either prong of *Strickland* by seating two jurors who had misunderstood the questions about presumption of innocence and burden of proof.  A fairminded jurist could agree that an initial misunderstanding of these important issues, once corrected, did not establish these jurors were biased.

Third, Juror No. 2 disclosed that he was familiar with a potential witness, Detective Infantes, because he was friends with his brother.  The Appellate Division found Juror No. 2's knowledge of the witness was only in passing.  Juror No. 2 had acknowledged that he could be impartial, and Dell'Italia chose not to ask any further questions.  A fairminded jurist could agree with the Appellate Division's conclusion that counsel was not ineffective for failing to uncover bias or challenge Juror No. 2 for cause.

Finally, the Appellate Division determined that the failure to discover Juror No. 10's knowledge of a witness and familiarity with the crime scene during voir dire was neither deficient performance nor was it prejudicial.  Juror 10 did not disclose his knowledge of Wildermann because he did not recognize his name.  He only recognized Wildermann's face after he testified.  Although Juror No. 10's family had a friendship with Wildermann's family, they grew up in the same neighborhood for decades, Juror No. 10 only greeted Wildermann in passing and had not done so in the past six months.  The Appellate Division credited Dell'Italia's PCR testimony, that he chose to keep Juror No. 10 because he believed, based on his physical observations of his body language and facial expressions, that Juror No. 10 was impartial and possibly favorable to the defense.  On habeas review of ineffective assistance of counsel claims, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (quoting *Strickland*, 466 U.S. at 690)).  A fairminded jurist could agree that it was not deficient performance to keep Juror No.

10 on the jury based on his casual but long-term acquaintance with a witness, and knowledge of the crime scene from living in the area. Therefore, having found no indication of a biased jury, the Appellate Division's finding that Petitioner failed to establish *Strickland* prejudice is not an unreasonable determination of the facts or law. This Court denies Grounds One and Two of the Amended Petition.

### 3.  Ground Three:  Ineffective Assistance of Counsel:  Failure to Call Defense Witnesses on Third Party Guilt

Petitioner presented a third-party guilt defense, that the State's star witness, Henry Rivera, murdered Piotr Raczek. Petitioner contends his trial counsel was ineffective for failing to call witnesses in support of his third party guilt defense. (ECF No. 20 at 30-44). In support of this claim, three witnesses, who had spoken to police after Raczek's murder, testified at Petitioner's PCR remand hearing. Petitioner contends their testimony would have aided his defense. Specifically, David Gallo would have testified that he lived on the same street as Raczek, and he heard shots fired on the night of Raczek's murder. When he looked out the window, he saw a Hispanic man running down the street. He knew the man was not white or black and did not have dreadlocks. Petitioner was a black man, and he wore dreadlocks at the time of the murder. Gallo said he saw the man holding something in his hand, and he tucked it under his clothing. Gallo saw the man enter the passenger side of the vehicle that drove away from the murder scene. Petitioner contends the prosecutor's zealous cross-examination of Gallo at the PCR hearing suggested that she was gravely concerned about his testimony. Gallo would have testified at trial, but no one asked him.

Nisha Bhatia was also a witness. At the PCR remand hearing, she testified that after hearing gunshots on the night of Raczek's murder, she saw a man running down Thorne street, and the man entered the right front passenger side of the car that drove away. She would have

testified at trial if asked.  Finally, Wilson Isaza testified at the PCR remand hearing.  He heard gunshots on the night Raczek was murdered, and he saw a man running and enter the front passenger door of a vehicle before it sped off.  The man was between 5'5" and 5'8" tall.  Testimony of these witnesses would have contradicted that of Henry Rivera, who testified that Petitioner exited his car, shot Raczek, entered the driver's side of the car and drove away.

At the PCR hearing, Dell'Italia testified that he would have called these witnesses, if he had not been able to get their statements in through Detective Wilder's testimony.  Petitioner contends this is not true because his counsel did not provide a witness list, and neither he, nor any agent for the defense, spoke to these witnesses.  Petitioner claims Dell'Italia's testimony at the PCR remand hearing, that he made a tactical decision not to call these witnesses, should not have been credited.  Furthermore, Dell'Italia did not get the entirety of the witnesses' statements in through cross-examination of the detectives.  Among other the things, Dell'Italia failed to submit testimony that Gallo, Isaza, and Bhatia told the police:  (1) the fleeing suspect could not be African-American; (2) the fleeing suspect was left-handed (Petitioner is right handed); (3) the fleeing suspect did not have dreadlocks; (4) the fleeing suspect was of a different height and build than Petitioner; and (5) the fleeing suspect entered the passenger seat, which is where Rivera had claimed he was sitting.  Much of the evidence that Dell'Italia tried to get in through Detective Wilder was hearsay, which the prosecutor objected to and the trial court sustained.  Petitioner contends this was not a trial strategy that should be given any deference on habeas review.

Petitioner also contests the PCR court's conclusion that these witnesses were unable to give police a good description of what they saw.  Gallo was sure the man he saw was not a white person or black person but probably Hispanic.  He saw the man trying to hide something under his clothing while he was running.  Petitioner is a dark-skinned black man, and at the time of the murder, he

was very thin and had long dreadlocks.  Gallo's description of a left-handed man of Hispanic origin and medium build fit Rivera's description and supported Petitioner's third-party defense.  Rivera is 5'7" and Petitioner is six feet tall.  Isaza's testimony that the gunman was between 5'5" and 5'8" fits Rivera, and this description was not elicited through Detective Wilder.  Finally, Bhatia said she saw the gunman enter the passenger side of the vehicle, contrary to Rivera's testimony.  For these reasons, Petitioner states the PCR court's decision is not supported by the record and should be rejected.  Petitioner asserts he was prejudiced by his counsel's failure to call these witnesses at trial because their testimony supported his third party defense that Rivera was the gunman.

Respondents, in opposition to this claim (ECF No. 23 at 41-49), note that these witnesses agreed it was very dark and difficult to see that night.  At the PCR remand hearing, Dell'Italia testified that he had an investigator contact Gallo.  He would have called Gallo to testify if necessary, but he was able to get the witnesses' descriptions of the suspected gunman before the jury through cross-examination of the detectives who took their statements.  Dell'Italia did not want to subject these witnesses to cross-examination because it was so dark out that night.  Respondents argue that Dell'Italia's strategic decision not to call these witnesses was sufficient reason for the PCR court to deny the ineffective assistance of counsel claim.

In his reply brief, Petitioner summarizes the importance of these witnesses' testimony to his defense.  (ECF No. 24 at 1-21).  The State had no eyewitness to Raczek's murder.  Thus, the State relied heavily upon Rivera's testimony of what transpired.  Conflicts with Rivera's testimony held great importance to the defense.  Petitioner contends the PCR court undervalued the testimony of these witnesses.  The PCR court did not address Bhatia's and Isaza's testimony that they saw person running from the shooting enter the front passenger side of the car, where Rivera claimed to have been sitting.

The highest reasoned state court determination of this claim is that of the PCR court on remand.  The PCR court stated:

> Petitioner claims that [c]ounsel was ineffective for failing to call three fact witnesses who made observations in the area of the shooting on the night in question. Those witnesses are David Gallo, Nisha Bhatia and Wilson B. Isaza. Petitioner claims that each of the three witnesses would have been willing to testify if called to do so. The Court heard from all three of these witnesses at the [e]videntiary [h]earing and agrees that it is likely that all three would have testified at the trial if served with a subpoena. They all testified at the [e]videntiary [h]earing, clearly it was not the highlight of their life having to testify but they were willing to comply with the subpoena and the Court presumes they would have done so at the trial. However, it is not just whether the witnesses would have appeared to testify, it is the content of their testimony that is crucial in this matter. In regard to Gallo, Bhatia and Isaza, Petitioner claims that they would have aided him in his claim of third party guilt.  That is, that he was not the person who committed the crime, but rather that it was the State's "star witness" Rivera who committed the crime.
>
> In this regard, the [C]ourt first heard from David Gallo. []Petitioner would have the Court believe that Mr. Gallo positively identified the shooter as a Hispanic male and also that the Hispanic man had a gun in his hand when he saw him running. In his testimony at the [e]videntiary [h]earing and in his statement given shortly after the incident in question, Mr. Gallo indicated that the person he saw running looked Hispanic. He further indicated in his statement and at the [e]videntiary [h]earing that he made his identification based on "Spanish hair."  Mr. Gallo also indicated ["]it was so dark, I couldn't really see him.["]  Finally, Mr. Gallo indicated that he just assumed that the individual was Hispanic based on hair. Petitioner would also have the Court believe that Mr. Gallo saw the "Hispanic male" running with the gun in his hand. However, at the [e]videntiary [h]earing, Mr. Gallo made clear that he saw this male running with his two hands clenched in front of his stomach. He never indicated that the person he saw had a gun or that it was in one particular hand or the other[,] as []Petitioner would have the Court believe.
>
> Wilson lsaza also testified at the [e]videntiary [h]earing. Wilson Isaza testified that he gave a statement to the Jersey City Police on September 1, 2005. Mr. Isaza's testimony at the [e]videntiary [h]earing is consistent with his statement given to the [p]olice

shortly after the incident. Mr. Isaza testified that he heard several shots, that he went to his window and that he saw a man running to a car parked in front of the house next door to his. Mr. Isaza indicated that he gave a description of the person running but stated during the [e]videntiary [h]earing that he did not know how he could possibly identify or give a description as it was dark and there was no streetlight[,] and that he was on the third floor.  Mr. Isaza later stated in his testimony that he did not get a very good look at the person running, it was very dark. Mr. Isaza stated on numerous occasions during his testimony that he did not get a very good look and could only give a very limited description of the person. Petitioner claims that [c]ounsel was ineffective for failing to call these two witnesses as the descriptions given by Isaza and Gallo do not fit the description of [] Petitioner.  Petitioner also seems to argue that Isaza and Gallo's memory may have faded with time. Certainly, that is a common occurrence. However, both Mr. Gallo and Mr. Isaza testified that they did not have a very good look at the person in question and that was why they were having difficulty giving a description[,] not passage of time.

Nisha Bhatia also testified at the [e]videntiary [h]earing[,] and she also indicated that it was very dark at the time of the incident and stated during cross examination that it was too dark to either see a gun or to describe the male with any specificity. She indicated the same in regard to the parked car that the male was allegedly entering. The best that she could do was to say that it was dark, perhaps. black, blue or midnight green. Ms. Bhatia clearly stated during the [e]videntiary [h]earing that she could not describe the male with any specificity.

The Court heard from Petitioner's [t]rial [c]ounsel[,] John Dell'Italia[,] at the [e]videntiary [h]earing. Mr. Dell'Italia testified that he had an investigator contact each of these witnesses and decided based on trial strategy not to call the witnesses. First, this Court clearly believes all three of those witnesses would have been available for the [t]rial.  However, it is the content of what the witnesses would have said[,] not just their availability[,] that perhaps could make a difference. Mr. Dell'Italia clearly stated during his testimony that he did not call any of these witnesses because they had limited knowledge, they contradicted themselves during the testimony and there were flaws with their statements and proposed testimony in that they made very little observation regarding the man they saw running from the scene of the incident. The inability of these witnesses to recall, recollect and relate is clearly not due to the passage of time, all three had indicated[,] since they were first spoken to by the [p]olice shortly after the incident[,]

24

that they made very few observations, that it was very dark, and frankly, they could not be very certain in their identifications and/or testimony. Mr. Dell 'Italia stated that the [t]rial strategy was that he was able to elicit from other witnesses[,] such as the State's witnesses[,] that there were conflicting descriptions of the gunman in this matter. His position is that the [j]ury heard the conflicting descriptions of the gunman and that[,] therefore, he was able to have that evidence in front of the [j]ury without the witnesses being cross examined by a seasoned Assistant Prosecutor regarding their inability to make accurate observations due to the darkness, etc.

This Court cannot find by a preponderance of the evidence that [] Petitioner has met the two prong <u>Strickland</u> test regarding the failure to call any of these three witnesses. The witnesses knew then[,] and know now[,] very little, if anything, about this incident. They all admitted they made limited observations due to the dark. The failure of [t]rial [c]ounsel to call any of these three witnesses certainly does not fall below an objective standard of competence. Also, the second prong of <u>Strickland</u> would require [] Petitioner [to] prove that the failure to call these witnesses materially contributed to the conviction.  Again, this is mere speculation and not supported by any of the evidence.  Whether these three witnesses would have been cross examined by the seasoned Assistant Prosecutor or by a novice, their observations were extremely limited and they indicated that when they first spoke to the[p]olice shortly after the incident.

(ECF No. 9-30 at 41-45) (alterations added).

"[W]hen a state court has decided that counsel performed adequately" . . .  "a federal court may grant relief only if every 'fairminded juris[t]' would agree that every reasonable lawyer would have made a different decision."  *Dunn v. Reeves*, 141 S. Ct. 2405, 2411 (2021) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).  Dell'Italia was able to cross-examine Detective Stambuli about information he received from witnesses at the scene of Raczek's murder.  (ECF No. 9-45 at 39).  Detective Stambuli confirmed that Mr. Gallo had described the suspect as a Hispanic male.  (*Id.*)  After the prosecutor objected to testimony that specifically identified a non-testifying witness and the statement her or she gave, Dell'Italia was able to bring forth that Detective Stambuli received conflicting descriptions of the suspected gunman, including the

25

suspect's height, build, and hairstyle. (*Id.* at 39-46). This evidence came in without subjecting the witnesses to cross-examination on the certainty of their observations. A fairminded jurist could agree with the Appellate Division's determination that it was a reasonable trial strategy for Dell'Italia to prompt these descriptions through cross-examination of the State's witnesses, rather than subjecting these witnesses to cross-examination likely to call their testimony into doubt. Therefore, this Court denies Ground Three of the Amended Petition.

**4.  GROUND FOUR:  Ineffective Assistance of Counsel-Sidebar Conferences During Jury Selection**

Petitioner alleges in Ground Four of the Amended Petition that his trial counsel was ineffective for failing to protect his right to participate in sidebar conferences during jury selection. (ECF No. 20 at 44-51). The PCR court credited Dell'Italia's testimony that he used the "lawyer shuttle system," going back and forth from sidebar to inform Petitioner of the discussions during jury selection. Petitioner contends the record refutes Dell'Italia's testimony. There were more than one hundred sidebar conferences with jurors, and there is no evidence in the voir dire transcripts that Dell'Italia ever reported any of these discussions to Petitioner. Moreover, at the first PCR hearing, the trial court denied having been informed that Petitioner's listening device was not working during trial, and that Dell'Italia used the "lawyer shuttle system." Petitioner contends that if he had been informed as to each juror's statements at sidebar conferences, it was implausible that he would not have requested any challenges for cause.

In opposition to this claim, Respondents assert that: (1) the claim is unexhausted because it was not raised in the petition for certification in the New Jersey Supreme Court; (2) Petitioner did not establish that the Appellate Division's Opinion is contrary to or involved an unreasonable application of clearly established federal law; and (3) Petitioner's reliance on state law is not cognizable on habeas review. (ECF No. 23 at 49-54). Respondents also contend that Petitioner

failed to establish that the PCR remand court's determination of this claim was contrary to or involved an unreasonable application of the ineffective assistance of counsel standard in *Strickland*.

In his reply brief, Petitioner concedes that he did not raise this claim in his petition for certification before the New Jersey Supreme Court.  (ECF No. 24 at 37-46).  However, Petitioner urges that this failure to exhaust should be excused because, under New Jersey court rules, once a petition for certification is granted, the New Jersey Supreme Court will review all issues raised on appeal.  Therefore, any petition for certification is tantamount to raising all claims raised below.  Further, Petitioner argues that this claim is worthy of habeas review because counsel was "actively complicit" in undermining Petitioner's right to participate in sidebar conferences during jury selection.

This claim is unexhausted.  Exhaustion requires a petitioner to assert his claims in one complete round of the State's established appellate review process, including a petition for discretionary review.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  However, a habeas court may deny an unexhausted claim on the merits.  28 U.S.C. § 2254(b)(2).  It is appropriate to do so here.  The Appellate Division credited Dell'Italia's testimony that he used the lawyer shuttle system to keep Petitioner informed of the juror's responses to questions posed at sidebar conferences.  Based on the doubly deferential standard of habeas review of counsel's performance at trial, Petitioner's argument that it is implausible he would not have challenged any juror for cause is not persuasive.  This Court has reviewed the entirety of the jury selection transcripts. While the transcripts do not contain descriptions of counsel walking away from sidebar conferences to confer with Petitioner, many jurors were excused for cause.  Dell'Italia was given an opportunity to question every juror.  It is apparent from the transcript that Dell'Italia paused to

confer with Petitioner before he informed the trial court that Petitioner was satisfied with the jury. (ECF No. 9-41 at 126). It is plausible that either Petitioner was made aware of the jurors responses at sidebar or that he agreed to allow his counsel to make the jury selection determinations based on his professional judgment. Therefore, a fairminded jurist could agree with the Appellate Division's denial of Petitioner ineffective assistance of counsel claim. This Court denies Ground Four of the Amended Petition.

**GROUND FIVE:  Ineffective Assistance of Counsel-Failure to Object to the Trial Court's Response to a Jury Question**

In Ground Five of the Amended Petition, Petitioner submits that his trial counsel's failure to respond to the jury's question about the meaning of a pre-arraignment conference deprived him of his Sixth Amendment right to effective assistance of counsel. (ECF No. 20 at 51-52). The State introduced evidence that Petitioner attended a pre-arraignment conference on his carjacking case on August 30, 2005, the day before Mr. Raczek's murder. (ECF No. 46 at 6-9, 21). During deliberations, the jury asked the trial court to define "pre-arraignment." (ECF No. 9-48 at 66). Petitioner submits that he was prejudiced when the trial court "detoured" into the topic of probable cause, and instructed the jury that the grand jury found probable cause that Petitioner committed the crimes charged, without discussing the difference between probable cause and reasonable doubt. (*Id.* at 67-69). Thus, the trial court suggested to the jury that another jury had heard the evidence against Petitioner and ruled in the prosecution's favor. Dell'Italia did not object or request an instruction describing the difference between probable cause and reasonable doubt.

In opposition to Ground Five, Respondents maintain habeas relief is not warranted because the jury was properly instructed that the indictment was not evidence of Defendant's guilt, and that the State had the burden of proving each element of the charges beyond a reasonable doubt. (ECF No. 23 at 54-59). In his reply brief, Petitioner argues that there is a wide consensus in federal

precedent that a jury should be told nothing about an indictment except that it is not evidence of guilt. (*Id.*, citing *e.g.*, *United States v. McFarlane*, 491 F. 3d 531 (2d Cir 2007); see Third Circuit Model Jury Instructions 3.07; and see *pro se* Supplemental Brief on Appeal, ECF No 9-8 at 6, n.3). Therefore, trial counsel erred by not objecting or requesting any "damage control" after the trial court emphasized that the grand jury found probable cause to charge Petitioner with the crimes before the jury.

Petitioner raised this claim on direct appeal as trial court error, and Respondents have treated the habeas claim as a challenge to the Appellate Division's determination of the trial court error on direct appeal. Petitioner did not raise this issue as an ineffective assistance of counsel claim in the PCR court proceedings. Therefore, the Sixth Amendment ineffective assistance of counsel claim in the petition is unexhausted. Again, a habeas court may deny an unexhausted claim. 28 U.S.C. § 2254(b)(2). The ineffective assistance of counsel claim fails on the merits because counsel was not ineffective for failing to object to an appropriate instruction.

The Appellate Division on direct appeal determined this claim as follows:

> Defendant next argues that the trial judge improperly responded to one of the questions the jury posed during its deliberations. The jury asked, "what's a pre-[a]rraignment?" The judge then explained the pre-arraignment process to the jury and placed it in context by also explaining the process leading up to the pre-arraignment conference. The judge instructed the jury as follows:
>
>> [L]et me give you a little context. When the police arrest and charge an individual with an offense, they fill out a complaint, they sign that complaint. That complaint in and of itself under our Constitution is insufficient to institute a prosecution for any crime that carries a term of imprisonment more [than] one year. If the crime that they're charging you with carries a potential sentence of more than one year, you have a [c]onstitutional [r]ight as a citizen of this State to have the matter presented to the Grand Jury before you can be prosecuted for that offense.

The Grand Jury serves as a buffer between the citizens of this State and the law enforcement mechanism of the State. <u>The law enforcement officers are required to present evidence to the Grand Jury to establish two things, by a standard of probable cause which is far different than proof beyond a reasonable doubt as I have explained to you. They must establish two things in the Grand Jury. First, that the crime was committed. Second, that there is probable cause to believe that the [d]efendant is the one who committed it, the person they charged.</u> If they can't do that, if the Grand Jurors are not satisfied that there's probable cause to believe one of both of those things exist, then they refuse to return an indictment. If they refuse to return an indictment, the case is over. It's done. There is no charge any longer against that citizen.

On the other hand, if they are satisfied the State [has] presented evidence that convinced them it [has] probable cause to believe a crime was committed and the Defendant is the one who committed it, they return an indictment. That's a formal charging document.

The first time in our system as it is structured today, the first time a defendant is actually given a copy of that indictment, which he has a constitutional right to, is at what we call a [p]re-[a]rraignment Conference.

Prior to his appearing before a judge, there is a required court proceeding that he must attend. If he fails to attend, a warrant is issued for his arrest. He gets put in jail. It is mandatory. You have to be there. You're given a copy of the [i]ndictment, along with what we call [d]iscovery . . . It's basically this is the evidence we have. Here's the formal charging document. … We try to get all the preliminaries out of the way because the actual first step before a judge is called the [a]rraignment.

So, the pre-[a]rraignment comes first. You get all your materials. We get things out of the way. We explain certain programs the [c]ourt runs and things

like that to a defendant that would otherwise take up a lot of time before the [j]udge. So, he gets all of that in advance of the [a]rraignment, okay.

Then, at the [a]rraignment, that is the first formal proceeding before a court, but right from the return of the [i]ndictment, the case is scheduled for disposition. There are a lot of preliminary matters that take place before we actually get together in a sitting like this, pick a jury and have a trial. It is all part of that same process.

Does that explain it to you, ma'am? Everybody understand what it means.

Jurors: Yes.

The Court: It is just a preliminary proceeding. It is required. It is mandatory, okay.

(ECF No. 9-10 at 4, 31-33) (alterations and emphasis in original).

Even though [D]efendant did not object to the judge's instruction at trial, [D]efendant argues "the judge's response to the jury unfairly prejudiced [D]efendant because it elevated the grand jury's return of the indictment in a manner that tended to lessen the State's burden of proof at trial." We disagree.

We perceive no error, much less plain error, in the judge's response to the jury. The information he provided, that an indictment is issued on probable cause, rather than proof beyond a reasonable doubt, was correct and in no way "lessen[ed] the State's burden of proof at trial." In his main charge, which was given to the jury earlier in the day, the judge also specifically told the jury that

[t]he [i]ndictment is not evidence of the [d]efendant's guilt on the charges. An indictment is a step in the procedure to bring the matter before the [c]ourt and jury for the jury's ultimate determination as to whether the [d]efendant is guilty or not guilty of the charges stated in it.

. . . .

31

> The [d]efendant on trial is presumed to be innocent and unless each and every essential element of an offense charged is proved beyond a reasonable doubt, the [d]efendant must be found not guilty of that charge.
>
> The burden of proving each element of the charges beyond a reasonable doubt rests upon the State and that burden never shifts to the [d]efendant. The [d]efendant in a criminal case has no obligation or duty to provide or to prove . . . his innocence or to offer any proof relating to his innocence.

We will presume the jury adhered to the judge's clear, accurate response to the jury's question and all of his other instructions throughout the trial. State v. Muhammad, 145 N.J. 23, 52 (1996). We therefore reject [D]efendant's contention on this point.

(ECF 9-10 at 33-35) (alterations in original).

If a jury "instruction is ambiguous and therefore subject to an erroneous interpretation," the Supreme Court has held the proper inquiry for a reviewing court is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). Instruction on the reasonable doubt standard is of constitutional significance. The trial court's explanation of a pre-arraignment conference was accurate and designed to explain to the jury its purpose, in the context of the overall criminal proceeding. The jury instruction was not given as a history of Petitioner's proceeding; it was given in the context of how all citizens of the United States who are charged with certain criminal offenses by law enforcement have rights protected by a grand jury. Most importantly, the trial court instructed that a grand jury must find probable cause "*which is far different than proof beyond a reasonable doubt as I have explained to you.*" (emphasis added). The court properly instructed the jury on the meaning and importance of reasonable doubt. (ECF No. 9-48 at 67). The trial court also made clear that the jury, in reaching

its verdict, could only consider the evidence presented in this case, and that an Indictment is not evidence. (*Id.* at 4-5). The Appellate Division's denial of the alleged trial court error on direct appeal was not contrary to nor did it involve an unreasonable application of clearly established federal law. Furthermore, Petitioner's unexhausted  ineffective assistance of counsel claim for failing to object to the trial court's alleged error fails because the jury instructions were proper on de novo review, as well as deferential habeas review.

**GROUND SIX:  Ineffective Assistance of Counsel-Failure to Seek a Limiting Instruction on Other Bad Acts Evidence**

In Ground Six of the Amended Petition, Petitioner alleges his trial counsel was ineffective for failing to request a limiting instruction on "other bad acts evidence" under New Jersey Rule of Evidence ("NJRE") 404(b). (ECF No. 20 at 53-54). The prosecutor asked witness Henry Rivera about a letter Petitioner wrote to a friend from jail. In the letter, Petitioner asked his friend and others to "push up" on Rivera to stop him from testifying against Petitioner. Petitioner was not charged with any crimes based on the letter. The prosecutor used the letter to show Petitioner's consciousness of guilt. Petitioner, however, further argues that the prosecutor improperly used the letter to argue that Petitioner was evil. Thus, his trial counsel should have asked for a limiting instruction that the testimony regarding "other wrong" evidence could only be used for consciousness of guilt and not for criminal propensity.

Respondents submit that Ground Six fails to state a federal claim for relief. (ECF No. 23 at 80). Alternatively, Respondents argue there was no need for a limiting instruction because the letter was not "other crimes" evidence, rather it was intrinsic proof of Petitioner's consciousness of guilt. (*Id.* at  59-61). The evidence showed Petitioner wrote a letter to a friend, Rasheen Smalls, while Petitioner was in jail awaiting trial in this matter. Rivera had already come forward and agreed to testify against Petitioner. Petitioner asked Smalls and others to "push up on" Rivera

33

because Rivera could not "get on the stand." Petitioner wrote "don't let him finish me please." In his reply brief, Petitioner concedes that he raised this claim on direct appeal as a trial court error. However, he now presents the claim as ineffective assistance of counsel, an unexhausted claim. (ECF No. 24 at 48-50).

A habeas court may, if appropriate, deny an unexhausted claim on the merits. 28 U.S.C. § 2254(b)(2). In his *pro se* claim on direct appeal, Petitioner asserted his claim as follows; "The Trial Court's Failure to Provide the jury with a Limiting Instruction on the Use of Evidence of Defendant's Request to "Push up on" a State's Witness Deprived Defendant of Due Process and a Fair Trial." (ECF No. 9-10 at 5). The Appellate Division acknowledged Petitioner's *pro se* claims stating, "[d]efendant's supplemental contentions are clearly without merit and do not warrant further discussion. R. 2:11-3(e)(2)." (ECF No. 9-10 at 34-35). Here, Petitioner presents the claim under the guise of ineffective assistance of counsel.

When a habeas court denies an unexhausted claim on the merits, review is, by necessity, de novo. This Court may not decide whether the letter was admissible under NJRE 404(b) because that is a question of state evidentiary law. *Estelle*, 502 U.S. at 67 (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("We have stated many times that "federal habeas corpus relief does not lie for errors of state law") (additional citations omitted). To avoid review of the state evidentiary ruling, the deficient performance prong of *Strickland* must be posed in terms of whether failure to request a limiting instruction "'so infected the entire trial that the resulting conviction violates due process.'" *Estelle*, 502 U.S. at 71 (quoting *Cupp v. Naughton*, 414 U.S. 141, 147 (1973) (additional citations omitted). The omitted instruction must be viewed in the context of the jury instructions and the trial record as a whole. *Id.* at 72. The Due Process Clause has limited operation outside the specific guarantees enumerated in the Bill of Rights. *Id.* at 73. Therefore, this Court must

determine "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Id.* at 72 (quoting *Boyde*, 494 U.S. at 380).

Petitioner's letter was introduced by the prosecutor.  The prosecutor obtained Rivera's testimony that he believed the phrase "push up on" meant Petitioner's friends should kill Rivera to prevent him from testifying that Petitioner killed Raczek.  (ECF No. 9-44 at 32-44).  Dell'Italia cross-examined Rivera on his interpretation of the letter, confronting Rivera with the fact that Petitioner instructed his friends to tell Rivera he could keep telling the prosecution lies for now, but he must refuse to testify.  (ECF No. 9-44 at 68-71).  The defense was that the letter showed Rivera was lying about Petitioner killing Raczek to protect himself, and Petitioner did not mind if Rivera continued to lie, as long as he did not testify against Petitioner.  Dell'Italia asked  Rivera why he was still alive, if "push up on" meant to kill.  (*Id.*)  Based on this testimony, the prosecutor offered the letter as intrinsic evidence of Petitioner's consciousness of guilt of murdering Raczek and preventing the truth from coming out.  Dell'Italia countered that the letter established Rivera's testimony was a lie.  There was no basis for a limiting instruction at this time because the evidence was not offered to show propensity to threaten or kill witnesses.

In summation, Dell'Italia argued that the letter meant what it said, Rivera was lying to the State about who killed Raczek, and Petitioner's friends should convince Rivera not to lie at trial.  (ECF No. 9-47 at 27).  The defense theory was that Rivera shot Raczek and "threw Petitioner under the bus," as the letter stated.  Dell'Italia presciently reminded the jury that neither his own argument nor that of the prosecutor is evidence, and they must decide the case on the evidence.  (*Id.* at 32).   Then, the prosecutor insinuated Petitioner's propensity to kill witnesses in his summation:

> We have the Ahmad Johnson here, a well-dressed, well-spoken
> young man . . . and then we have the Ahmad Johnson who asks

35

> friends to push up on a State's witness…Gee, can't help but think
> isn't that what happens to Pete Raczek?

(ECF No. 9-47 at 38) (alterations added).

When this statement is viewed in the context of the trial record and the jury instructions as a whole, it did not so infect the entire trial as to deny Petitioner his constitutional right to a fair trial. There was strong evidence of Petitioner's motive to kill Raczek to prevent his testimony because it would tie Petitioner to the attempted murder of Mr. Herring, and his opportunity to do so while on bail the day after the pre-arraignment conference, when he learned of Rivera's proposed testimony. Absent the prosecutor's improper comment in summation, the jury certainly saw a parallel between Raczek's murder and Petitioner's attempt to interfere with Rivera's testimony, whether the letter contained a threat or not. Moreover, Dell'Italia's failure to request a limiting instruction was cured, first by counsel's own instruction to the jury that closing arguments were not evidence, and second by the trial court's instruction, which was given directly after the closing arguments. The trial court instructed the jury:

> You and you alone are the sole and exclusive judges of the evidence, of the credibility of the witnesses and the weight to be attached to the testimony of each witness.
>
> Regardless of what Counsel said or I may have said recalling the evidence in the case, it is your recollection of the evidence that should guide you as judges of the facts.
>
> Arguments, statements, remarks, openings and summations of Counsel are not evidence and must not be treated as evidence. Although the attorneys may point out what they think is important in the case, you must rely solely on your understanding and recollection of the evidence that was admitted during the trial. Whether the defendant has been proven guilty beyond a reasonable doubt, is for you to determine based on all the evidence presented during trial. Any comments by counsel are obviously not controlling on you.

> It is your sworn duty to arrive at a just conclusion after considering
> all the evidence which was presented during the course of this trial.

(ECF No. 9-48 at 7-8).  For these reasons, this Court finds that counsel's failure to request a

limiting instruction regarding Petitioner's letter did not violate his due process right to a fair trial,

nor did it result in prejudice under *Strickland*.  Therefore, this Court denies Ground Six of the

Amended Petition.  This Court will next address Ground Eight of the Amended Petition and reserve

Ground Seven, a claim of cumulative trial and appellate counsel errors, for the final claim.

**GROUND EIGHT:    Inadmissible Hearsay Testimony Violated Petitioner's Sixth Amendment Right to Confrontation**

In Ground Eight of the Amended Petition, Petitioner raises two claims of violation of his

Sixth Amendment right to confront witnesses against him.  (ECF No. 20 at 55).  These claims are

based on:  (1) the admission of hearsay testimony of Piotr Raczek, who identified Petitioner as the

person who stole his car at gunpoint, after which Raczek was murdered and unavailable at trial,

and (2) the hearsay testimony of Petitioner's girlfriend, that she had not confirmed Petitioner's

alibi claim for Raczek's murder.

Respondents oppose relief on Ground Eight.  First, Respondents submit that Petitioner

failed to exhaust his confrontation clause claims in state court, but instead relied on state

evidentiary law.  (ECF No. 23 at 80-81).  Petitioner raised both state evidentiary and federal

Confrontation Clause claims, as demonstrated by the Appellate Division's Opinion.  (ECF No. 9-

10 at 14-19).  On the merits of the claims, Respondents rely on the Appellate Division's

determination that any error in admission of hearsay was harmless based on the overwhelming

evidence of Petitioner's guilt of Raczek's murder, for the purpose of preventing him from

testifying against Petitioner at the carjacking trial.  (ECF No. 23 at 62-68).  Respondents further

contend any error in admitting Detective Wilder's testimony, that he followed up with Petitioner's

girlfriend about Petitioner's alibi, and that she did not confirm that she was with Petitioner when

Raczek was killed, was harmless because the defense was able to draw out testimony that

Petitioner's girlfriend had only said that she could not remember whether she was with Petitioner

that night because she works long hours and the days blend together.  (*Id.*)

In his reply brief, Petitioner contests the harmless error conclusion.  (ECF No. 24 at 51-

55).  He submits that absent the improper hearsay testimony, and assuming the three witnesses

who had testified at the PCR hearing had been called to cast doubt on Raczek's identification of

Petitioner, the evidence in this case was not overwhelming.  (*Id.*)

The highest reasoned state court determination of this claim was that of the Appellate

Division on direct appeal.  The court stated:

> Because Raczek had been murdered prior to trial, he was obviously not available to testify. The State called Officer Infantes to testify about the statements made by Raczek immediately after the carjacking and Detective Armstrong to testify about Raczek's subsequent identification of [D]efendant as the perpetrator. Defendant did not object to this testimony. For the first time on appeal, [D]efendant contends the trial judge's admission of Raczek's statements was an abuse of discretion resulting in plain error which not only violated the hearsay rules, but also [D]efendant's constitutional right to confront witnesses against him. We disagree.
>
> Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." N.J.R.E. 801(c); see also State v Savage, 172 N.J. 374, 402 (2002). Hearsay is generally inadmissible because it is "untrustworthy and unreliable[.]" *State v. White*, 158 N.J. 230, 238 (1999). Some hearsay, however, is admissible, because "exceptions are created out of necessity and are justified on the ground that 'the circumstances under which the statements were made provide strong indicia of reliability.'" *Id.* at 238 (quoting State v. Phelps, 96 N.J. 500, 508 (1984)).
>
> The Confrontation Clause contained in the Sixth Amendment, which applies to the states by way of the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" The Supreme Court of the United States has held that the Confrontation

Clause bars the admission of "[t]estimonial statements of witnesses absent from trial" except "where the declarant is unavailable, and only where the [D]efendant has had a prior opportunity to cross-examine." Crawford v. Washington, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369, 158 L. Ed. 2d 177, 197 (2004).

We review the admission of evidence employing an abuse of discretion standard. Here, Raczek was unavailable to testify at trial, but [D]efendant had not had a prior opportunity to cross-examine him. Therefore, the testimony of the officers concerning what Raczek had told them was hearsay and subject to timely objection. However, [D]efendant raised no objection to this testimony at trial. We review arguments raised for the first time on appeal under a "plain error standard." Under that standard, a conviction will be reversed only if the error was "clearly capable of producing an unjust result." R. 2:10-2; see also State v. Macon, 57 N.J. 325, 337 (1971). Errors in admitting evidence, including those brought to the trial judge's attention, are not grounds for reversal if deemed harmless. Macon, supra, 57 N.J. at 337-38. This is true even if the errors are of a constitutional dimension. Id. at 338. Trial [e]rrors may be found harmless when evidence of guilt is overwhelming. State v. Gillispie, 208 N.J. 59, 93 (2011).

That is clearly the case here. The State presented overwhelming evidence that [D]efendant murdered Raczek to make him unavailable as a witness on the carjacking charge. Rivera testified that [D]efendant confided in him that he had carjacked Raczek's vehicle and that he needed to take steps to ensure Raczek would not testify against him on that charge. The day after [D]efendant's pre-arraignment, Rivera accompanied [D]efendant as he drove to Raczek's home. Rivera saw [Defendant][8] get out of the car carrying a gun. He then received two telephone calls from [D]efendant indicating he saw Raczek. Rivera heard the shots and was with [D]efendant as he drove away from the scene. Raczek's neighbors saw [D]efendant's car on the street and [D]efendant's own phone records confirmed that the calls were made. Defendant later sent a letter to a friend from jail stating that Rivera needed to be silenced before he could testify.

---

[8] The Appellate Division's Opinion contains an error, corrected above.  The court stated "Rivera saw Raczek getting out of the car carrying a gun."  In Rivera's testimony about Raczek's murder, the prosecutor asked Rivera if he knew whether *Defendant* was armed at the time he exited his car to approach Raczek for the purpose of bribing or intimidating him into not testifying about the carjacking.  (ECF No. 9-44 at 52).  Rivera answered "When he got out of the car I noticed it [a gun]."

Under these circumstances, where there was overwhelming evidence demonstrating [D]efendant's guilt, independent of Raczek's identification of him, we perceive no plain error in the admission of the officers' testimony. Given the strength of the other evidence presented, this testimony was not "clearly capable of producing an unjust result." Macon, supra, 57 N.J. at 337. Therefore, we reject [D]efendant's contention.

. . .

Defendant also argues that Detective Wilder should not have been permitted to testify about a conversation he had with a woman who [D]efendant identified as his girlfriend. The following colloquy occurred at trial:

> [Prosecutor]: Did you take time to review [Defendant's] statement after you returned to the Homicide Squad?
>
> [Wilder]: Yes, I did.
>
> [Prosecutor]: What action, if any, did you take to confirm or refute his version of events?
>
> [Wilder]: He mentioned a girlfriend he met with on the evening of August 31st.
>
> [Prosecutor]: Did you locate her?
>
> [Wilder]: Yes. He identified her during the statement as Sabrina [Bailey] from East Orange. We located Sabrina Bailey in Newark.
>
> [Prosecutor]: Without saying specifically what she said, did she confirm his version of events that he was with her?
>
> [Defense counsel]: Objection, your Honor.
>
> THE COURT: Overruled.
>
> [Wilder]: No, she did not.

Defendant now contends, relying upon State v. Bankston, 63 N.J. 263 (1973), he was denied a fair trial as a result of Detective Wilder's testimony because this testimony "suggested that the investigating

detective possessed information from [D]efendant's girlfriend that implicated [D]efendant in the crimes." We disagree.

In <u>Bankston</u>, our Supreme Court confirmed that the hearsay rule is not violated when a police officer explains that he approached a suspect or went to a crime scene based "upon information received," because such testimony explains his subsequent conduct and shows that the officer was not acting in an arbitrary manner. <u>Id.</u> at 268; <u>accord</u> <u>State v. Luna</u>, 193 <u>N.J.</u> 202, 217 (2007). However, the Bankston Court cautioned that both the hearsay rule and a [D]efendant's Sixth Amendment right to be confronted by the witnesses against him or her are violated if the officer becomes more specific and repeats what another person told the officer linking the defendant to a crime. <u>Bankston</u>, <u>supra</u>, 63 <u>N.J.</u> at 268-69.

According to the Court, "[w]hen the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." <u>Id.</u> at 271. <u>See also</u> <u>State v. Branch</u>, 182 <u>N.J.</u> 338, 352 (2005) (holding the phrase "based on information received" may be used by police officers to explain their actions, but only if necessary to rebut a suggestion that they acted arbitrarily and where use of that phrase does not create an inference that the defendant was implicated in a crime by some unknown person).

Nonetheless, erroneous admission of such testimony is not automatic grounds for reversal, but may be assessed under the harmless error standard. <u>Bankston</u>, <u>supra</u>, 63 <u>N.J.</u> at 272-73. Contrary to [D]efendant's contention, Detective Wilder's testimony did not lead to the inescapable conclusion that Bailey had specifically advised that [D]efendant was involved in criminal activity. Rather, the detective's brief testimony merely indicated the police had followed up on [D]efendant's statement as part of their investigation.

More importantly, even if the judge erred in overruling [D]efendant's objection, defense counsel went on to ask [the] detective a number of questions about Bailey on cross-examination, including specific questions about whether Bailey was able to corroborate [D]efendant's account that he was with her on the night of the murder. The following colloquy occurred during cross-examination:

> [Defense Counsel]: Now, regarding Sabrina Bailey, you did go to her residence, correct?

[Wilder]: No. I did not.

[Defense Counsel]: Mr. Hart went to her residence, Calvin Hart?

[Detective]: I believe he spoke with her, yes.

[Defense Counsel]: And in fact, Ms. Bailey neither confirmed nor denied whether or not [Defendant] was there on August 31, correct?

[Wilder]: She recalled a different date.

[Defense Counsel]: But she said she wasn't sure, isn't that correct?

[Wilder]: Correct.

[Defense Counsel]: She said, in fact, she works long hours and her days run together, isn't that so?

[Wilder]: Yes.

[Defense Counsel]: So, when - - as a result of speaking with her, it is pretty much inconclusive, correct?

[Wilder]: Yes.

[Defense Counsel]: Because she really didn't remember, correct?

[Wilder]: Correct.

Thus, whatever prejudice was caused to [D]efendant by the State's very limited questioning of Wilder on this topic was more than ameliorated by defense counsel's pointed cross-examination, which elicited that Bailey was not sure whether [D]efendant was with her that evening. Therefore, any error in admitting Wilder's testimony was harmless.

(ECF No. 9-10 at 14-19) (alterations added).

When there has been a Confrontation Clause error, a habeas court must conduct harmless error review and determine whether there has been actual prejudice, "which is 'more than a reasonable possibility that the error was harmful.'" *Johnson v. Superintendent Fayette SCI*, 949 F.3d 791, 799 (3d Cir. 2020) (quoting *Davis v. Ayala*, 576 U.S. 257 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619 (1993)). "When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test [the Supreme] Court outlined in *Brecht* and the one Congress prescribed in AEDPA." *Brown v. Davenport*, 142 S. Ct. 1510, 1517 (2022)). "No one questions that a state court's harmless-error determination qualifies as an adjudication on the merits under AEDPA." *Id.* at 1520. "In sum, where AEDPA asks whether every fairminded jurist would agree that an error was prejudicial, *Brecht* asks only whether a federal habeas court itself harbors grave doubt about the petitioner's verdict." *Id.* at 1525. For habeas relief, a petitioner must satisfy both tests. *Id.* at 1524. "[A] petitioner might be able to prevail under *Brecht* thanks to favorable circuit case law but still lose under AEDPA because no comparable holding exists in [Supreme Court] precedents. *Id.* at1525 (alteration added). "[I]f AEDPA makes winning habeas relief more difficult, it is because Congress adopted the law to do just that." *Id.* at 1526.

The Appellate Division found the trial court's error in admitting hearsay evidence of Raczek's identification of Petitioner as the carjacker, and admitting his girlfriend's statement to police about his alibi were harmless based on the overwhelming evidence of Petitioner's guilt. Rivera's testimony, corroborated by the cell phone evidence of Petitioner's whereabouts and his phone calls to Rivera, Petitioner's motive to steal a fast car for a drive-by shooting of his girlfriend's father, Petitioner's motive for and the timing of Raczek's murder, and the use of Petitioner's car to flee the scene of Raczek's shooting is overwhelming evidence. While Petitioner

contends that absent Raczek's identification of Petitioner, he could have called into question whether Rivera had lied to cover up his own guilt of shooting Raczek, a fairminded jurist could agree with the Appellate Division's determination that the error was not prejudicial in the face of all evidence of Petitioner's guilt.   Therefore, this Court denies Ground Eight of the Amended Petition.

**GROUND NINE:  Admission of Victim's Out-of-Court Identification of Petitioner violated Petitioner's Right to Due Process**

In Ground Nine of his Amended Petition, Petitioner contends admission of Raczek's out-of-court identification violated Petitioner's right to due process because Petitioner was the only person wearing a hooded jacket in the photo array shown to Raczek, who had described the carjacker as wearing a hooded sweatshirt.  (ECF No. 20 at 55-56).  In opposition to Ground Nine, Respondents argue the claim was procedurally defaulted because it was not raised at trial.  (ECF No. 23 at 68-73).  Alternatively, Respondents assert that the photo array was not suggestive for the following reasons:  (1) the detective who conducted the photo array did not choose the six photos; (2) the photos were displayed one at a time; (3) the photos were all of black men with similar features and wearing dreadlocks; (4) Raczek had not reported the suspect was wearing a hooded sweatshirt, but rather a black jacket; and (5) Raczek confidently chose Petitioner's photo after looking at each photograph.  (*Id.*)  Petitioner responds that his counsel was ineffective by failing to challenge the identification procedure, and this Court should evaluate the claim under the federal standard announced by the Supreme Court in *Manson v. Brathwaite*, 432 U.S. 98 (1977).  (ECF No. 24 at 56).

The highest reasoned state court determination of his claim is that of the Appellate Division on direct appeal.  The court stated:

Defendant next argues, again for the first time on appeal, that the identification procedure used by Detective Armstrong during Raczek's examination of the photo array was "impermissibly suggestive." He also asserts the judge's instructions to the jury "regarding the out-of-court identification procedure were insufficient" because they did not comply with the requirements recently established by our Supreme Court in State v. Henderson, 208 N.J. 208 (2011). We reject both contentions.

The two-step analysis for determining the admissibility of eyewitness identification set forth in Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), was adopted in New Jersey in State v. Madison, 109 N.J. 223 (1988).

> [A] court must first decide whether the procedure in question was in fact impermissibly suggestive. If the court does find the procedure impermissibly suggestive, it must then decide whether the objectionable procedure resulted in a "very substantial likelihood of irreparable misidentification." In carrying out the second part of the analysis, the court will focus on the reliability of the identification. If the court finds that the identification is reliable despite the impermissibly suggestive nature of the procedure, the identification may be admitted into evidence.

[Id. at 232 (citations omitted).]

As the Court noted, "reliability is the linchpin in determining the admissibility of identification testimony[.]" Ibid. (quoting Manson, supra, 432 U.S. at 114, 97 S. Ct. at 2253, 53 L. Ed. 2d at 154).

Defendant did not challenge the identification procedure used by Detective Armstrong before or during the trial. Although under the plain error rule we will consider allegations of error not brought to the trial court's attention that have a clear capacity to produce an unjust result, Macon, supra, 57 N.J. at 337-39, we generally decline to consider issues that were not presented at trial. Neider v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973). "Because the issue [of the alleged suggestibility of the identification procedure] never was raised before the trial court, because its factual antecedents never were subjected to the rigors of an adversary hearing, and because its legal propriety never was ruled on by the trial court, the issue was not properly preserved for appellate review." State v. Robinson, 200 N.J. 1, 18-19 (2009). However, even if we consider that issue here,

we perceive nothing in the record to suggest the identification procedure used by Detective Armstrong was in any way suggestive. The detective did not select the six photos that were included in the photo array. The array consisted of the "faces of black males with similar features" and each man had dreadlocks. Prior to showing the photos to Raczek one at a time, Detective Armstrong provided him with written instructions on how the array would be conducted. Raczek was informed that the person who committed the crime may or may not be in the group of photos; certain aspects of appearances, such as hairstyles and facial hair, are easily changed; and the detective would not provide any feedback on Raczek's selection because he did not know the identity of the suspect after examining each photo, Raczek made a positive, indeed visceral, identification of [D]efendant as the person who had carjacked his vehicle. There is simply nothing in the procedure that was used to support [D]efendant's contention that it was suggestive or unreliable.

Defendant nevertheless argues the procedure must have been suggestive because Raczek did not identify [D]efendant as the result of examining photos immediately after the carjacking. However, [D]efendant's photo was not shown to Raczek on the day of the carjacking. The fact he did not select a suspect from one of the photos shown to him on that date, therefore, bolsters his subsequent identification of [D]efendant.

Raczek told Detective Armstrong the person who took his car was wearing all black, including a black jacket. Defendant complains that he was the only person in the photo array who was depicted wearing a black "hoodie." However, he did not demonstrate at trial that there was anything suggestive about the clothing he wore in the photograph that would have made Raczek's identification unreliable. Finally, there is no basis for [D]efendant's contention that Detective Armstrong did not properly document the results of the identification procedure. The detective had Raczek sign and date the photo he selected as the suspect. He followed up by completing a Supplementary Investigation Report, which detailed the identification procedure. Defendant's related contention, that the judge erred by not instructing the jury in accordance with the new identification procedures recently developed by our Supreme Court in Henderson also lacks merit.

(ECF No. 9-10 at 23-27).

The Appellate Division found that this issue was procedurally defaulted because it was not raised at trial. The New Jersey Supreme Court explained that this rule is well established and regularly followed:

> It is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.

*State v. Robinson*, 974 A.2d 1057, 1069 (2009) (quoting *Nieder v. Royal Indem. Ins. Co.*, 62 N.J. 229, 234, 300 A.2d 142 (1973) (citation and internal quotation marks omitted)). This claim is procedurally defaulted. However, Petitioner asserts his trial counsel was ineffective for failing to raise this claim at trial. For the sake of completeness, this Court will review, under the appropriate habeas standard, the Appellate Division's determination of this claim on the merits.

The Appellate Division correctly identified *Manson v. Brathwaite*, 432 U.S. 98 (1977) as the controlling Supreme Court precedent. In *Manson*, the Court recognized that single photo identification procedures and show-up identifications are typically impermissibly suggestive and usually unnecessary, but the Court declined to adopt a *per se* approach to exclusion of impermissibly suggestive identifications. 432 U.S. at 109-13. Instead, identifications are admissible if sufficiently reliable. *Id.* at 114-17.

Based on a review of Detective Armstrong's trial testimony, Detective Armstrong took Raczek's statement about his carjacking about twenty minutes after the carjacking occurred. (ECF No. 9-45 at 105-120). Detective Armstrong showed Petitioner some photos that potentially matched his description of the carjacker, but Raczek did not identify any of the persons in those photos. Approximately six days after the carjacking, Razek's stolen car was identified as being involved in a drive-by shooting in Newark. Detective Armstrong accompanied Raczek to the

Newark Police Department to attempt an identification.  Detective Bella of the Newark Police Department chose the photos for a photo array.  The procedure was done using an automated, computerized system.  Detective Armstrong completed the investigative display report after reviewing the instructions.  The photos were shown to Raczek one at time, allowing him as much time as he wanted.  He said no to the first four photos he was shown.  When Raczek saw the fifth photo, he became teary eyed and paused.  Detective Armstrong showed him photo number six, and Petitioner said no and asked to see the photos again.  Raczek went through photos one through four and said no.  Looking at the fifth photo, he became nervous, shaky, and teary eyed.  He said he was sure that was the carjacker.  Raczek signed and dated the photo.  Detective Armstrong completed the necessary forms and took Raczek back to the Jersey City Police Department to give his formal statement.   The Appellate Divisions' finding that the identification procedure was not impermissibly suggestive, and its application of Supreme Court precedent in *Manson* were objectively reasonable.  Furthermore, on de novo review, Raczek's identification of Petitioner was reliable.  Therefore, Ground Nine of the Amended Petition fails.

**GROUND TEN:  Trial Court Violated Petitioner's Sixth Amendment Right to Confront Witness Henry Rivera by Limiting Cross-examination, and Further Violated Petitioner's Right to Due Process by Failing to Give a Cooperating Witness Instruction**

In Ground Ten of the Amended Petition, Petitioner first asserts that the trial court violated his Sixth Amendment right to confront witnesses by limiting the cross-examination of the State's witness, Henry Rivera, and other witnesses concerning their prior arrests.[9]  (ECF No. 20 at 56). Second, Petitioner asserts the trial court violated his right to due process by failing to give a

---

[9] Petitioner did not provide any factual support of limitations imposed on the cross-examination of any witness other than Henry Rivera.  (ECF No. 20 at 56; ECF No. 24 at 57-58). Therefore, the Court will limit discussion of the confrontation claim to the cross-examination of Henry Rivera.

cooperating witness instruction.  (*Id.*)  Respondents argue the jury instruction claim is not cognizable on habeas review because Petitioner relies on alleged error of state law.  (ECF No. 23 at 81).

## 1.  Sixth Amendment Confrontation Clause Claim

In opposition to Petitioner's Confrontation Clause claim, Respondents contend the trial court properly precluded Petitioner from cross-examining Rivera about prior unrelated arrests, as determined by the Appellate Division on direct appeal.  (ECF No. 23 at 73-75).  In his reply brief, Petitioner contends the trial court's limitation of Rivera's cross-examination to his prior convictions, excluding arrests, was contrary to or involves an unreasonable application of the Supreme Court's decision in *Davis v. Alaska*,[10] where the Court held a defendant has the right to confront an accusatory witness with evidence suggesting that he had some hope to gain favor from the prosecution or the government generally, thus exposing a potential bias.  (ECF No. 24 at 57-58) (emphasis added).

Habeas review is of the Appellate Division's determination of this claim on direct appeal. The Appellate Division stated:

> Defendant asserts the trial judge erred by denying his request to cross-examine Rivera about his prior and unrelated arrests or to introduce information concerning these arrests through other State witnesses. We disagree.
>
> During defense counsel's cross-examination of Rivera, the following exchange occurred:
>
> [Defense Counsel]: So your decision at a later date to call [the police] and give them information was to make sure that you weren't going to get charged, correct?
>
> [Rivera]: Yes.

---

[10] *Davis*, 415 U.S. 308 (1974).

[Defense Counsel]: And in fact, when you did speak to [the police] on March 3rd, you said you wanted immunity from prosecution?

[Rivera]: Yes.

[Defense Counsel]: Because you didn't want to get charged with a homicide?

[Rivera]: Because just being with somebody you can get charged.

[Defense Counsel]: And you know what it is like to be charged with homicide don't you?

At that point, the prosecutor's objection was sustained by the judge. Defense counsel conceded Rivera had not been convicted of any prior homicide. Indeed, one of the arrests to which defense counsel wanted to refer concerned a matter where Rivera had been acquitted of the charge after a trial. After sustaining the prosecutor's objection, the judge gave the jury a curative instruction to disregard defense counsel's question.

Later, defense counsel attempted to ask Detective Stambuli whether he was aware from his meetings with Rivera that he had been recently arrested. The judge conducted a Rule 104 hearing which established that Rivera had been cooperating with the Drug Enforcement Agency (DEA) in an ongoing investigation that was not related to the present matter. The judge ruled defense counsel could ask the detective whether he was aware of Rivera's cooperation with the DEA, but prohibited him from asking whether Rivera had been arrested.

Contrary to [D]efendant's contentions, the judge's rulings were entirely proper. N.J.R.E. 609 permits impeachment of a witness' credibility with evidence of "the witness' conviction of a crime[.]" (Emphasis added [in original]). Thus, the witness's prior arrests may not be used for this purpose. State v. Jenkins, 299 N.J. Super. 61, 72 (App. Div. 1997) (noting N.J.R.E. 609 "applies only to criminal convictions.") In addition, [D]efendant provided no evidence that any of Rivera's arrests were in any way related to the events involved in this case. Thus, the judge did not abuse his discretion in prohibiting defense counsel from pursuing this line of questioning.

In addition, [D]efendant was permitted to introduce evidence of Rivera's prior convictions in an attempt to impeach him. Defendant complains the judge "only" instructed the jury that "[t]his evidence

> may only be used in determining the credibility or believability of"
> this witness.

(ECF No. 9-10 at 27-31) (alterations added).

The Supreme Court decision that governs this claim on habeas review is *Delaware v. Van Arsdall*, 475 U.S. 673 (1986). The Court ''recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'" (quoting *Davis v. Alaska*, 415 U.S. 308, 316–317 (1974) (citing *Greene v. McElroy*, 360 U.S. 474 (1959)). However,

> [i]t does not follow, of course, that the Confrontation Clause of the
> Sixth Amendment prevents a trial judge from imposing any limits
> on defense counsel's inquiry into the potential bias of a prosecution
> witness. On the contrary, trial judges retain wide latitude insofar as
> the Confrontation Clause is concerned to impose reasonable limits
> on such cross-examination based on concerns about, among other
> things, harassment, prejudice, confusion of the issues, the witness'
> safety, or interrogation that is repetitive or only marginally relevant.

*Id.* at 679. The Court held,

> a criminal defendant states a violation of the Confrontation Clause
> by showing that he was prohibited from engaging in otherwise
> appropriate cross-examination designed to show a prototypical form
> of bias on the part of the witness, and thereby "to expose to the jury
> the facts from which jurors ... could appropriately draw inferences
> relating to the reliability of the witness." *Davis v. Alaska*, *supra*, 415
> U.S., at 318, 94 S.Ct., at 1111.

*Id.* The Court also found that the harmless-error standard applied to such claims, stating

> the constitutionally improper denial of a defendant's opportunity to
> impeach a witness for bias, like other Confrontation Clause errors,
> is subject to *Chapman* harmless-error analysis. The correct inquiry
> is whether, assuming that the damaging potential of the cross-
> examination were fully realized, a reviewing court might
> nonetheless say that the error was harmless beyond a reasonable
> doubt. Whether such an error is harmless in a particular case
> depends upon a host of factors, all readily accessible to reviewing
> courts. These factors include the importance of the witness'
> testimony in the prosecution's case, whether the testimony was

51

> cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. *Cf. Harrington*, 395 U.S., at 254, 89 S.Ct., at 1728; *Schneble v. Florida*, 405 U.S., at 432, 92 S.Ct., at 1059.

To determine whether the trial court's limitation of Rivera's cross-examination to his prior convictions was harmless error, this Court begins by reviewing the prosecutor's examination of Rivera. Rivera testified that he first began to talk to detectives from Hudson County after they located him for questioning. (ECF No. 9-44 at 63-64). At that time, he was in custody for smoking marijuana, a violation of his parole conditions on a 1997 firearms charge. (*Id.*) Rivera admitted he had some other drug convictions, and also a conviction related to an incident with a corrections officer while incarcerated. (*Id.* at 64-65.) When the detectives first came to talk to Rivera about the present case, he decided not to talk to them. (*Id.* at 65). Later, he called his parole officer and said he wanted to talk to the detectives. (*Id.* at 67). He gave the detectives two statements. (*Id.*) Although Rivera requested immunity for testifying, the prosecutor declined. (*Id.* at 66) He was not promised anything nor did he receive anything for his testimony. (*Id.*)

On cross-examination, Rivera admitted that the reason he contacted the detectives was to make sure he was not charged for murdering Piotr Raczek. (*Id.* at 71-72.) Dell'Italia questioned Rivera "and you know what it is like to be charged with a homicide, don't you?" (*Id.* at 72). The trial court sustained the prosecutor's objection, and this led to the trial court's determination that Dell'Italia could only question Rivera about his past convictions, not his past arrests. (*Id.* at 73-74.)

Dell'Italia further prompted Rivera's testimony that he asked for immunity before giving his statement to the detectives, and that he did so to prevent himself from being charged with Raczek's homicide. (ECF No. 9-44 at 75). Indeed, Rivera's whole purpose in talking to police

was to make sure they knew that, although he was present when Petitioner killed Raczek, he had nothing to do with it. (*Id.* at 75). Dell'Italia inquired "[a]nd you were prepared to give them whatever information was necessary, is that right?" (*Id.* at 76). At first, Rivera agreed, but then he explained that he only told police what happened. (*Id.*) Dell'Italia also elicited Rivera's testimony that he was never charged with Raczek's murder. (*Id.* at 85-86). Rivera admitted that when gave his statements to the detectives, he was in custody for a parole violation involving a firearms charge. (*Id.*) He also admitted to prior convictions for resisting arrest, eluding and drug crimes. (*Id.* at 86). In summation, Dell'Italia focused on Rivera's admission that he requested immunity from prosecution for killing Raczek before testifying. (*Id.* at 22). Dell'Italia noted Rivera did not get immunity, but he argued that Rivera did the next best thing, he testified that Petitioner was the murderer, and Rivera was with him but did not know he planned to kill Raczek. (*Id.* at 22-23). Dell'Italia ended his summation:

> Mr. Rivera comes to you in a gilded cage because of his cooperation with the police and with the State and with other various law enforcement agencies. He does not have to suffer any of the slings and arrows of his prior bad acts.

Based on this record, a reasonable jurist could agree with the Appellate Division's finding of harmless error for limiting cross-examination on prior bad acts to convictions. Dell'Italia had all the ammunition needed to call into question Rivera's motivation for testifying. Rivera conceded he wanted to make sure he was not the person who was prosecuted for killing Raczek because he was present at the crime scene with Petitioner. Hearing more about Rivera's prior arrests, for which he could not possibly receive immunity from the State in this trial, would have added nothing to this line of defense. Therefore, this Court denies the Confrontation Clause Claim in Ground Ten of the Amended Petition.

**2.  Whether Failure to Give a Cooperating Witness Instruction Violated Petitioner's Right to Due Process**

Petitioner's second claim in Ground Ten of the Amended Petition is that the trial court erred by failing to give a cooperating witness instruction.[11]  (ECF No. 20 at 56).  Respondents submit Petitioner has failed to establish that the Appellate Division's determination of this claim was contrary to, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States.  (ECF No. 23 at 76-77).  In his reply brief, Petitioner contends his jury instruction claim faults both the trial court for not giving the claim and Dell'Italia for not requesting the instruction.  (ECF No. 24 at 58).  The claim was exhausted as a trial court error on direct appeal, not an ineffective assistance of counsel claim.  Therefore, habeas review is of the Appellate Division's determination on direct appeal.  The Appellate Division held as follows.

> Generally, a defendant has a right, upon request, to a specific cautionary instruction that a witness' testimony must "'be carefully scrutinized and assessed in the context of this specific interest in the proceeding.'"  State v. Begyn, 34 N.J. 35, 54 (1961) (citation omitted).  However, the charge carries "risks for the defendant because phrasing is difficult to avoid conveying to the jury an impression that the court is suggesting his guilt solely because the witnesses have admitted theirs and implicated him." Id. at 55.  Thus, the Supreme Court has held that it is "[c]ertainly . . . not error, let alone plain error, for a trial judge to fail to give this cautionary

---

[11] Petitioner did not specifically invoke his Fourteenth Amendment due process right to a fair trial in his jury instruction claim in Ground Ten.  However, in Paragraph 7 of the Amended Petition, Petitioner asserts that all claims involve:  "either a misreading /misapplication of settled federal constitutional law, or an objectively unreasonable application of such law to the particular constellation of facts herein, or an unreasonable application of New Jersey's state court precedents implicating a federal right, or a clearly erroneous finding of fact that no reasonable or fair-minded jurist would make."  (ECF No. 20).  In his direct appeal brief, Petitioner discussed his Fourteenth Amendment due process right to a fair trial in his two-part claim that the trial court erred by limiting Rivera's cross-examination and then failed to give the model jury charge for cooperating witness testimony.  (ECF 9-6 at 47-59).  While the federal nature of the jury instruction claim on direct appeal was ambiguous, this Court will give Petitioner the benefit of the doubt and address the merits of the jury instruction claim under the Fourteenth Amendment Due Process Clause.

comment where it has not been requested." <u>State v. Artis</u>, 57 <u>N.J.</u> 24, 33 (1970).

Here, defense counsel did not request a cooperating witness instruction and, therefore, the judge did not err in failing to provide such an instruction to the jury. In addition, the judge instructed the jury it could consider, in determining a witness' credibility, whether the witness had an "interest in the outcome of the trial," as well as any "possible bias" in favor of the side for whom the witness testified[.]" Therefore, we reject [D]efendant's argument on this point.

(ECF No. 9-10 at 30-31) (alterations added).

The "only question" for a habeas court for a Fourteenth Amendment Due Process challenge to a jury instruction "is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973) (additional citations omitted)). It is not enough that the instruction was erroneous, a habeas petitioner must also show that the instruction "violated some Constitutional right." *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

In New Jersey, the cooperating witness charge is simply "a cautionary comment by the court regarding the credibility of witnesses who may have a special interest in the outcome of the cause, which might lead to influencing their testimony, because of some involvement in the criminal situation out of which the indictment and trial of the defendant arose." *State v. Begyn*, 167 A.2d 161, 171 (1961). The Appellate Division reasonably found the instruction given by the trial court, that the jury could determine a witness's credibility based on a witness's interest in the outcome of the trial, or based on "any possible bias" in favor of the side for whom the witness testified, was sufficient to alert the jury to its ability to consider whether Rivera's testimony was motivated by his hope that testifying against Petitioner would garner him some favor with the State. This argument was presented to the jury by cross-examination of Rivera and in summation.

This Court finds the trial court's failure to *sua sponte* give a more specific cooperating witness instruction did not deprive Defendant of his due process right to a fair trial.  Therefore, the Appellate Division reasonably determined this claim, and this Court denies the jury instruction claim in Ground Ten of the Amended Petition.

**GROUND SEVEN:  Ineffective Assistance of Counsel-Cumulative Errors**

Finally, Petitioner contends that the cumulative errors of his trial and appellate counsel deprived him of his Fourteenth Amendment right to due process, his Sixth Amendment right to a fair and impartial jury, and his Sixth Amendment right to a fair trial.  (ECF No. 20 at 54-55).  In opposition to this claim, Respondents maintain that the cumulative error claim is unexhausted and unreviewable.  (ECF No. 23 at 61-62).  In reply, Petitioner argues there is no authority establishing that a claim of cumulative error is, in and of itself, a "ground" for relief that must be exhausted. (ECF No. 24 at 50).  Instead, it is simply the sum of the parts of the petition.  Therefore, the Court should not hold this "cumulative error" claim requires exhaustion.

The Third Circuit has held cumulative error claims are standalone constitutional claims that are subject to exhaustion and procedural default.  *Collins v. Sec'y of Pennsylvania Dep't of Corr.*, 742 F.3d 528, 541 (3d Cir. 2014).  Nonetheless, habeas courts may deny unexhausted claims on the merits.  28 U.S.C. § 2254(b)(2).  Where there is overwhelming evidence of guilt, as here with Rivera's corroborated testimony, and Petitioner's motives and opportunity for the crimes, it is difficult to establish Petitioner's conviction was likely affected by counsel's errors.  *Strickland*, 466 U.S. at 696.  This Court found little or no evidence of prejudice resulting from errors of counsel.  Thus, Petitioner has not established *Strickland* prejudice, that but for the cumulative

prejudice of his counsel's errors, there is a reasonable probability he would not have been convicted. Therefore, this Court denies Ground Seven of the Amended Petition.

## IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because Petitioner's habeas claims are all without merit for the reasons set forth above, he has failed to make a substantial showing of a denial of a constitutional right, and his petition is not adequate to receive encouragement to proceed further.  This Court therefore denies Petitioner a certificate of appealability.

## V.  CONCLUSION

For the reasons stated above, this Court will deny Petitioner's Amended Petition (ECF No. 20), a deny a certificate of appealability.

An appropriate order follows.

Date:_____July 25_____, 2023

_____
Hon. Susan D. Wigenton
United States District Judge

57